# UNITED STATES DISTRICT COURT FOR THE
## MIDDLE DISTRICT OF LOUISIANA
### BATON ROUGE DIVISION

| | | |
|---|---|---|
| **DOUG WELBORN** *et al.*, | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **No. 3:12-CV-00220-JJB-SCR** |
| | § | |
| **THE BANK OF NEW YORK MELLON** *et al.*, | § | |
| **Defendants.** | § | |

## PLAINTIFFS' SUR-REPLY BRIEF TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT

Instead of making arguments tailored to Plaintiffs' pleadings, Defendants have attempted to re-cast Plaintiffs' pleadings to conform to their arguments. However, Defendants cannot prevail on a Rule 12(b)(6) motion by simply mischaracterizing the pleadings before the Court. Plaintiffs are suing under the federal RICO statute, and have established standing and a cognizable cause of action under RICO.

Defendants have cited a number of other cases involving MERS, but even a superficial survey of the cases cited by Defendants quickly reveals that those cases are focused on the validity of foreclosures or other states' recording laws and are irrelevant to the issues in this case. Ignoring Plaintiffs' pleaded cause of action under the federal RICO statute, the Defendants have attempted to confuse the Court by superimposing additional standing requirements and duty elements on Plaintiffs' RICO action by mischaracterizing Plaintiffs proximate causation arguments as enforcement actions under various laws.

As discussed below, Plaintiffs have standing to bring this RICO cause of action and have pleaded a cognizable RICO claim for damages suffered as a proximate cause of Defendants conducting their business through a pattern of mail fraud related to the MERS scheme.

1

# I. FEDERAL LAW EMPOWERS PLAINTIFFS TO SUE.

## A. Plaintiffs Have a Private Right of Action Under Federal Law.

Plaintiffs are suing under the federal RICO statute, and so only need to have a private cause of action under the RICO statute. The RICO statute under which Plaintiffs are suing creates a private cause of action for "[a]ny person injured in his business or property by reason of a violation under section 1962 of this chapter". 18 U.S.C. § 1964(c). Defendants have not disputed that this section generally confers a private cause of action under the RICO statute.

Instead, Defendants have attempted to confuse the Court by mischaracterizing Plaintiffs' RICO cause of action as an action to enforce state recording laws, the Trust Indenture Act of 1939 ("TIA"), or a fraud action based on representations in Defendants' prospectuses. Defendants' theory simply ignores the plain language of Plaintiffs' pleadings.

Plaintiffs are suing under the federal RICO statute based on predicate acts of mail and wire fraud relating to Defendants conducting their business through the MERS scheme. Second Amended Complaint (August 24, 2012)("SAC") ¶¶ 47-81. The only reasons Plaintiffs cite the TIA, state law, or Defendants' representations in security filings are to explain the context of the case and demonstrate that the alleged racketeering activities were the proximate cause of Plaintiffs' damages. As discussed in *Plaintiffs' Response to Defendants' Motion to Dismiss* ("*Response*") and below, Plaintiffs are not suing to enforce state law recording statutes, the TIA, or securities filings. *See Response*, at 14; discussion *infra* Part III(B). Therefore, Plaintiffs do not need to demonstrate any private cause of action under those statutes.

Defendants claim to have cited several cases for the proposition that Plaintiffs cannot "evade Congress's decision not to extend a private right of action by bringing suit under RICO instead". *Reply Brief in Support of Defendants' Joint Motion to Dismiss* ("*Reply*"), at 4.

2

However, contrary to Defendants' assertions, those cases do not hold that RICO standing requires there be a private right of action conferred in an underlying statute; rather, they hold that plaintiffs cannot circumvent an exclusive administrative remedy by suing under an alternative theory.[1] Under that reasoning, Plaintiffs would only be precluded from bringing a RICO action if an alternate statutory remedy were available *to Plaintiffs* for the same conduct complained of and for the same damages. *See Sutton*, 121 F.3d at 533-34.

Defendants have not alleged that Plaintiffs have any alternative and exclusive administrative remedy here. In fact, Defendants specifically deny that either the TIA or state recording statute provides any remedy for Plaintiffs to seek injunction or recover lost recording fees.[2] Plaintiffs' allegations are not preempted by any other statutory relief, and are therefore properly brought as a RICO action.

## B. Plaintiffs Have Power To Sue.

An agency charged with the maintenance of public records "has a real and actual interest in maintaining the integrity of those records." *State v. Daniel,* 903 So.2d 644, 649 (La. Ct. App. 2d Cir. 2005). In *Daniel*, the court held that the Department of Public Safety and Corrections ("DPS"), custodian of public records relating to criminal offenses, had standing to bring suit

---

[1] *See Danielsen v. Burnside-Ott Aviation Training Center, Inc.,* 941 F.2d 1220, 1227 (D.C. Cir. 1991) ("We agree with the District Court that the statutory scheme for administrative relief set forth by Congress in the [Service Contract Act] leaves no room for a RICO action on the present allegations."); *United States ex rel. Sutton v. Double Day Office Servs., Inc.*, 121 F.3d 531, 533 (9th Cir. 1997) ("..a party may not bring an action for the equivalent of [the Service Contract Act] damages under the guise of another statute."); *Ayers v. General Motors Corp.*, 234 F.3d 514, 522 (11th Cir. 2000) ("In light of this extensive administrative scheme, we think it clear that Congress did not intend to equate a violation of the Safety Act's notification requirements in and of itself with the felony of mail or wire fraud."); *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637 (2d Cir. 1989) ("Section 210 of the Energy Reorganization Act provides a remedy for an employee who has been discriminated against or discharged for making safety complaints. Section 210 also creates a procedural framework for vindication of this right...Artful invocation of controversial civil RICO, particularly when inadequately pleaded, cannot conceal the reality that the gravamen of the complaint herein is section 210 harassment.").

[2] *See Defendants' Memorandum of Law in Support of Defendants Motion to Dismiss First Amended Complaint ("Motion")*, pat 8 ("It is plain from the face of the law, and surrounding sections, that there is no express cause of action granted to anyone to bring a civil action to remedy an alleged violation of Article 3338 (even if it created a duty to record, which it does not)."); *Reply*, pat 4 ("Nothing in the TIA...grants Plaintiffs a right of action to sue for alleged violations of the statute.").

3

challenging an order to destroy an individual's criminal record, because it "directly impinges upon its duty to maintain its own records." *Id*. at 649.

Defendants rely on *State v. Jackson*, wherein DPS was found lacking standing to attack a guilty plea and criminal conviction, because such judgment did not concern record-keeping duties and infringed upon the district attorney's exclusive power to control criminal prosecutions. 935 So.2d 319, 322 (La. Ct. App. 2d Cir. 2006). The court drew an analogy to district court clerks: "As a consequence, the Bureau, as custodian of these public records, has no more standing to bring a civil action demanding nullity of the criminal court judgment herein than a district court clerk, as custodian of the mortgage and conveyance records, has standing to bring a civil action demanding nullity of a civil judgment holding a mortgage or conveyance to be invalid." *Id*.

By the court's own analogy, *Jackson* does not refute Plaintiffs' standing because Plaintiffs are not attacking the substance of the documents recorded or seeking to invalidate underlying MERS mortgages or conveyances. Like in *Daniel*, Plaintiffs are attempting to preserve the integrity of the records they are charged with maintaining, and the monetary and injunctive relief requested by Plaintiffs directly relates to Plaintiffs' duty to maintain their records. Furthermore, Plaintiffs are not infringing upon the exclusive powers of any other elected official by bringing this suit, as was the case in *Jackson*. *See* 935 So.2d at 322. The question for determining whether Plaintiffs have a right of action is "whether the plaintiff belongs to a particular class of persons whom the law grants a remedy for the particular grievance..." *Id*. at 321. Plaintiffs are within the class of persons for whom RICO grants a remedy, as further discussed herein. *See* 18 U.S.C. § 1964(c).

4

Defendants attack *Cott Index Co. v. Jagneaux*, 685 So.2d 656, 658 (La. Ct. App. 1996), claiming that clerks of court are not entities capable of bring suit. Defendants fail to recognize the specific distinction made in *Cott* between the office and the office holder. *See Cott*, 658 So.2d at 658 ("The office of the clerk of court has no legal status and is simply the functional organization by and through which the clerk of court carries out his/her official duties. As with the office of the sheriff, it is not *sui juris*, it does not have the capacity to enter into contracts, nor can it be a legal party to litigation. **Instead, it is the clerk, as the office holder, who enters into contracts and is the party to litigation.**" (emphasis added)). *Cott* did not hold that clerks of court were incapable of contracting or suing and being sued; *Cott* held that the particular office holder, not the office generally, is the party to the contract and the litigation. *Id.* Plaintiffs here are properly named by the office holder rather than the office generally.

## II.    PLAINTIFFS HAVE STANDING TO SUE.

### A.    Plaintiffs Have Suffered Article III Injury-In-Fact, and So Have Constitutional Standing to Sue.

The new argument raised in Defendants' *Reply* is that Plaintiffs cannot recover under RICO for their lost opportunity to record. The main case relied on by Defendants is easily distinguishable. In *Anderson v. Kutak, Rock & Campbell*, 51 F.3d 518, 521 (5th Cir. 1995), the plaintiff brought a RICO suit claiming lost opportunity to obtain an agricultural loan from the proceeds of Nebraska Investment Authority ("NIFA") bonds under a particular state program. The plaintiff was found to not have standing because he did not demonstrate he was eligible for an agricultural loan under the program requirements absent the defendants' conduct. *Id.* at 522. The plaintiff also failed to allege lost profits or lost money, and calculation of his damages would have required "extensive speculation". *Id.* at 523. Here, Plaintiffs have alleged lost profits, lost income and concrete financial loss, which *Anderson* does not deny are compensable RICO

injuries. *See id.* Defendants do not allege that Plaintiffs' injury is not quantifiable, distinguishing it from the speculative *Anderson* injury. *See Reply,* at 5.

Even if Plaintiffs' financial injuries were insufficient to confer standing, Defendants ignore the fact that Plaintiffs have also requested an injunction to correct and preserve the integrity of the public land records. *See* SAC ¶ 84. An agency charged with the maintenance of public records "has a real and actual interest in maintaining the integrity of those records." *Daniel,* 903 So.2d at 649.

**B.    Plaintiffs Have Alleged Injury to "Business or Property" Under RICO, and so Have Statutory Standing.**

Defendants' *Reply* raises the argument that MERS' business of tracking transfers of interests in mortgage loan ownership and servicing rights is not of the same type as Plaintiffs' business of maintaining a database of interests in real property. *See Reply,* at 8-9. Defendants focus their argument on the profit motives behind MERS. *See Reply,* at 8.   However, it is irrelevant why a governmental entity participates in business in the manner of a private actor; it only matters that it did so. *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 617 (1992) ("…it is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it only matters that it did so.").   Furthermore, "[e]ngaging in a commercial act does not require the receipt of fair value, or even compliance with the common-law requirements of consideration."  *Id.* at 616.   The fact that MERS is considerably more profitable than a clerk's office does not negate the commercial nature of Plaintiffs' business of recording.

The *Hawaii v. Standard Oil Co.* case relied on by Defendants held that "[l]ike the lower courts that have considered the meaning of the words "business or property," we conclude that they refer to commercial interests or enterprises…" 405 U.S. 251, 264 (1972).  This is not at odds with the *Republic of Argentina* holding which further defines the meaning of

6

"commercial".[3]  In *Hawaii*, the state brought suit as *parens patriae* claiming that aggregate injuries to citizens harmed the general economy of the state.  *See Hawaii* at 264-65.  The court reasoned that injury to the general economy "is no more than a reflection of injuries to the 'business or property' of consumers", and that, because individual consumers could recover themselves, the state could not seek double recovery.  *Id*. at 264.  The language relied upon by Defendants merely distinguishes between this general injury to the national economy and specific injuries to individual consumers. *See id*. at 265.[4]  Plaintiffs here are not suing for general injury to the parish economy; they are suing for a particular injury to their business of recording and maintaining records.  Since no individual citizen would have standing to sue for lost recording fees, there is not a possibility of double recovery.

Courts have held that lost tax revenue is injury to "business or property" under RICO. *See Hemi Group, LLC v. City of New York*, 130 S.Ct. 983, 950 (2010) (noting that the lower court of appeals determined that lost tax revenue was "business or property" under RICO, and finding it unnecessary to reach review of that issue); *see also Hemi*, 130 S.Ct. at 1001 (Breyer, J., dissenting) ("I would find that this RICO complaint asserts a valid harm to 'business or property'…the right to uncollected taxes is an entitlement to collect money…the possession of which is something of value." (internal quotations and citations omitted)).  Recording fee revenue is an entitlement to collect money analogous to tax revenue.  Justice Breyer specifically distinguished this type of injury from the alleged injury in *Hawaii*.  *Hemi* at 1001 (Breyer, J., dissenting) ("Hawaii's interest, both more general and derivative of harm to individual businesses, differs significantly from the particular tax loss at issue…").

---

[3] To the extent that *Republic of Argentina* and *Hawaii* give different holdings as to the definition of "commercial", *Republic of Argentina* supersedes *Hawaii*.

[4] "…the United States was authorized to recover, **not for general injury to the national economy** or to the Government's ability to carry out its functions, but only for those injuries suffered in its capacity as a consumer of goods and services." (emphasis added).

Case 3:12-cv-00220-JJB-SCR   Document 101-1   09/25/12   Page 7 of 22

III. **PLAINTIFFS HAVE STATED A COGNIZABLE CLAIM FOR RELIEF UNDER RICO.**

A. **Plaintiffs have not made a claim for damages related to loans that were not securitized, and so arguing that Plaintiffs have "conceded" such claims is a mischaracterization of the pleadings and briefing before the Court.**

Plaintiffs have not made a claim for damages related to loans that were not securitized, so Defendants' argument that Plaintiffs have "conceded dismissal of the claims to the extent they are based on loans that were not securitized" is a mischaracterization of the pleadings and briefing before the Court. *See* SAC ¶ 50 ("Under Federal laws, the Defendants had a duty to perfect and maintain the priority of the mortgages securing the mortgage-backed securities they created and sponsored.").

B. **There are Sufficient Allegations that Fraud Occurred as to Securitized Loans.**

1. *Defendants have mischaracterized the basis of Plaintiffs' claims.*

Defendants' argument that Plaintiffs do not have standing to enforce violations of the Trust Indenture Act is an effort to confuse the issues before this Court. Plaintiffs are not attempting to enforce violations of the Trust Indenture Act; they are suing under the Federal RICO statute. *See* SAC ¶¶ 47-81. This distinction is important.

The U.S. Supreme Court has specifically instructed that "RICO provides a private right of action for treble damages to any person injured in his business or property by reason of the conduct of a qualifying enterprise's affairs through a pattern of acts indictable as mail fraud." *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 647 (2008). A person commits mail fraud whenever that person, "having devised or intending to devise any scheme or artifice to defraud," uses the mail or any private or commercial carrier "for the purpose of executing such scheme or artifice or attempting so to do." 18 U.S.C. § 1341. In this case, Plaintiffs allege that they have been injured by their loss of recording fee revenue by reason of the conduct of

8

Defendants' affairs through a pattern of acts indictable as mail fraud related to the MERS scheme. SAC ¶¶ 1, 33, 41-50, 52, 55-61, 68-70, 72.

As part of their burden under Rule 12(b)(6), Plaintiffs must plead facts which, if true, would tend to show that the conduct of the Defendants' affairs through a pattern of acts indictable as mail fraud related to the MERS scheme has caused Plaintiffs to lose recording fee revenue that they would have otherwise received. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009). In other words, Plaintiffs need to show that the assignments of mortgages securing mortgage-backed securities would have been recorded but-for MERS. The Trust Indenture Act and the duties assumed by Defendants pursuant to their disclosures in their SEC prospectuses are only relevant to the *proximate cause* determination of Plaintiffs' damages in this case, and are not the basis for Plaintiffs' claims. As clearly pled in Plaintiffs' SAC, Plaintiffs are suing under the Federal RICO statute, and so need only show standing to sue under that statute. The Defendants' arguments that Plaintiffs are attempting to sue because of a breach of the Defendants' duties under the Trust Indenture Act mischaracterizes Plaintiffs' cause of action, and is merely a ruse to confuse the issues before the Court.

### 2. *The TIA Requires that the Mortgages be Properly Recorded.*

Defendants' attempt to splice words fails to address the proximate cause issue in this case, which is whether the assignments of mortgages securing mortgage-backed securities would have been recorded but-for the Defendants' use of the MERS scheme. Instead of merely relying on the industry practices prior to MERS under which mortgage assignments were recorded to maintain perfection of the mortgage (thereby prompting the creation of MERS in the first place to avoid the cost of recording mortgage assignments), the Plaintiffs have demonstrated that the mortgage assignments would have been recorded pursuant to obligations under Federal laws.

9

Defendants' argument that "the [Trust Indenture Act of 1939] does not require anyone to record anything" is disingenuous. The Trust Indenture Act of 1939 ("TIA") is structured so that before a debt-security non-exempted from the Act may be offered to the public, the indenture under which it is issued must be "qualified" by the SEC. *See Zeffiro v. First Penn. Banking & Trust Co.*, 623 F.2d 290, 293 (3d Cir. 1980) (for an excellent discussion on the structure and background of the TIA). The indenture is not deemed "qualified" until: "(1) the security has been issued under an indenture; (2) the person designated as trustee is eligible to serve; and (3) the indenture conforms to the requirements of §§ 310-318, 15 U.S.C. §§ 77jjj-77rrr. *Id.* Therefore, before a mortgage-backed security can be offered to the public, 15 U.S.C. § 77nnn(b)'s requirements must be met.

As a threshold matter, an "indenture" is traditionally defined as "a deed to which two or more persons are parties, and in which these enter into reciprocal and corresponding grants or obligations towards each other…" BLACK'S LAW DICTIONARY 911 (4th ed. 1973). Pursuant to this traditional definition, the TIA of 1939 defines "indenture" to mean any "mortgage, deed of trust, trust or other indenture, or similar interest or agreement…under which securities are outstanding or are to be issued[.]" 15 U.S.C. § 77ccc(7). The "under which securities are outstanding or are to be issued" language simply means that there are securities issued or to be issued against the indenture document. The Defendants' interpretation of "indenture" makes no sense because (1) security certificates are "registered", not recorded; and (2) the Defendants' interpretation renders 15 U.S.C. § 77nnn(b) nonsensical because it would require the recordation of a lien on the security certificate itself when the purpose of the TIA is to protect the security's investors. The less-tortured interpretation of "indenture" when interpreting 15 U.S.C § 77nnn(b) is the statute's plain-language stating that a mortgage is an "indenture" for purposes of the TIA.

10

15 U.S.C. § 77nnn(b), entitled "Evidence of recording of indenture", requires the obligor to submit a legal opinion stating either (1) the mortgage has been properly recorded and filed to create "the lien intended to be created thereby" (the intended lien will be based on the language of the trust agreement, as also set forth in the security's prospectus, but is typically a first lien), or (2) that recording is not necessary to create the intended lien. In other words, the obligor is required to either report that the indenture is properly recorded in order to ensure the liens' priority, or report that recording is not necessary to ensure the priority of the liens.

15 U.S.C. § 77nnn(b)(2) then further requires that, at least annually, the obligor submit a legal opinion stating that either (1) the mortgage has been properly *recorded, filed, re-recorded, and re-filed* as necessary to *maintain* the priority of the mortgage lien, or (2) that such recording, filing, re-recording, and re-filing is not necessary to maintain the priority of the mortgage lien. Thus, if an assignment of the indenture must be recorded to maintain the priority of the mortgage lien, then the obligor must report that the assignment has been properly recorded, or submit a legal opinion that recording is not necessary to maintain the mortgage lien's priority. Defendants' argument that this statute does not address assignments of the mortgage patently ignores the provisions of 15 U.S.C. § 77nnn(b)(2).

Defendants' argument that the TIA's duty to provide the above-discussed legal opinions is unrelated to any actual duty to record the mortgages and mortgage assignments necessarily assumes that an obligor can falsely report that an unrecorded mortgage has been recorded without any legal ramifications. However, Section 325 of the TIA provides that any person who willfully makes an untrue statement of a material fact or omits to state any material fact in any application, report, or document filed or required to be filed under the provisions of the TIA "shall upon conviction be fined not more than $5,000 or imprisoned not more than five years, or

11

both." 15 U.S.C. § 77yyy. Thus, the obligor (typically a wholly-owned subsidiary of one of the Defendants) would incur civil and criminal liability if it misrepresented that the mortgages and mortgage assignments were recorded when they were not. The Defendants created MERS as an artifice to defraud in order to misrepresent that recording of mortgage assignments was not needed to maintain the priority of the mortgage liens so that they could then claim that recording mortgage assignments was not necessary in their 15 U.S.C. § 77nnn(b)(2) reports.

The Defendants argue that "a mandate that someone deliver 'an opinion of counsel' about recordation is not a requirement that documents be recorded." *Reply*, at 11 (citing *Harriet & Henderson Yarns, Inc. v. Castle*, 75 F. Supp. 2d 818, 833 (W. D. Tenn. 1999)). However the quote from the cited case is taken out of context. In *Harriet*, the plaintiff was attempting to bring a cause-of-action under the TIA against a trustee for failing to review the filing and effectiveness of liens intended to be created by debenture notes. *Harriet & Henderson Yarns, Inc.*, 75 F. Supp. 2d at 833. The court determined that the plaintiff could not rely on 15 U.S.C. § 77nnn(b)(2) for their cause of action because the statute imposed the duty on the obligor, not the trustee being sued, and that the duty imposed by the statute is for the obligor to submit a legal opinion on whether the liens were properly recorded, not for the trustee to perform the required recording.

*Harriet* is not on point with the issues in this case. The court's opinion in *Harriet* does not address the legal ramifications if the obligor were to make material misrepresentations in its filings to the trustee regarding whether the liens were properly recorded. Defendants' reliance on *Harriet* ignores Plaintiffs' proximate cause argument that the potential civil and criminal liability for not properly recording a mortgage assignment and then reporting that they are properly recorded pursuant to the requirements of 15 U.S.C. § 77nnn(b)(2) would have caused the assignments to have been recorded but-for the Defendants' use of the MERS scheme.

Case 3:12-cv-00220-JJB-SCR   Document 101-1   09/25/12   Page 12 of 22

### 3.    *The Prospectuses Require that the Mortgages be Recorded.*

Plaintiffs' legal theory on why MERS is a scheme to defraud is simple:  (1) MERS purports to provide a system in which the Defendants and their subsidiaries can transfer notes without recording a corresponding assignment of the mortgage and have that mortgage maintain its perfection and priority; however, (2) this is false because, as discussed at length in the *Response*, mortgages are assigned as a matter of law under the Louisiana Civil Code whenever a note is transferred, and so an assignment of the mortgage must be recorded with the Parish in order to maintain the perfection and priority of the mortgage lien against a third party. *Response*, at 23-25.  Defendants are sophisticated financial institutions that can read the plain language of the Civil Code and are presumed to know the law; however, Defendants chose to conduct their affairs through a pattern of mail and wire fraud related to the MERS scheme in order to avoid paying Plaintiffs the recording fees to which they would otherwise have received.

Defendants' contention that the MERS caveat in their prospectuses somehow prevents MERS from being a scheme to defraud completely ignores Plaintiffs' legal theory.   The prospectuses represent that an assignment of each mortgage will be recorded promptly so as to make the assignment effective against third parties.  *See Response*, at 8 (discussing the representations made in prospectuses for mortgage-backed securities created and sponsored by Defendants).   The MERS caveat then immediately qualifies that, "[n]otwithstanding the preceding paragraph [regarding the recording of mortgage assignments], with respect to any Mortgage which has been recorded in the name of [MERS] or its designee, no mortgage assignment in favor of the Trustee will be required to be prepared or delivered." *Id.*

In other words, Defendants represent that they will properly record the mortgage assignments in order to maintain the priority of the lien as to third parties, but then immediately

13

Case 3:12-cv-00220-JJB-SCR   Document 101-1   09/25/12   Page 13 of 22

rely on a MERS caveat to avoid doing the recording. This contradiction begs the question: why would investors allow such a caveat when losing priority on the mortgage liens would eliminate the security that is the key benefit of a mortgage-backed security (especially considering that mortgage-backed securities were frequent financing tools for lending to subprime borrowers)? The reason why is because, using the mail and wires, the Defendants caused MERS to be represented as equivalent to recording in the public land records, even though this representation is false. Defendants would not have been able to rely on the MERS caveat to avoid their obligations without the acts of mail and wire fraud relating to the MERS scheme.

Therefore, Plaintiffs allege that but-for this pattern of mail fraud relating to the MERS scheme, the express representations in the prospectuses would have mandated that assignments of the mortgages to be recorded in the Parish land records. Once again, Defendants attempt to confuse the Court by mischaracterizing Plaintiffs' proximate cause claims as an attempt to sue under the prospectuses themselves; however, as demonstrated above, that is incorrect.

Defendants further argue that Plaintiffs do not understand the distinction between perfection and priority, and that "liens for MERS-registered loans are perfected because a lien is perfected upon recordation, regardless of priority." This argument completely ignores Plaintiffs legal theory, as discussed in depth in the Argument section III(B)(1) of the Plaintiffs' *Response*. Under Louisiana law, the mortgage is assigned whenever the note is transferred. Assignments of mortgages in the MERS system are not recorded when the notes are transferred. Therefore, the mortgage is unrecorded, and so the mortgage lien is not perfected. Since the mortgage lien is no longer perfected, it loses priority against recorded liens by third parties on the collateral property. As such, failure to properly record assignments of the mortgages in the MERS system results in an increased risk of losing priority on the liens securing the mortgage-backed securities.

14

### C.    The SAC Pleads Facts Alleging an Actionable RICO Enterprise.

The RICO enterprise in this case is MERS, a legal entity. In cases in which the alleged enterprise is a legal entity, proof that an entity has a legal existence satisfies the enterprise element. *U.S. v. Cauble*, 706 F.2d 1322, 1340 (5th Cir. 1983). The RICO enterprise and the RICO defendant must be separate entities. *Bishop v. Corbitt Marine Ways, Inc.*, 802 F.2d 122, 122 (5th Cir. 1986). Plaintiffs have properly alleged that the Defendants, financial institutions that are legal entities, are RICO defendants separate from MERS, a legal entity that is separate and distinct from the Defendants. SAC ¶¶ 68-71.

The cases cited by Defendants are not on-point to Plaintiffs' cause of action because they simply hold that an association-in-fact enterprise is not distinct from a corporate defendant when the alleged association is formed of the defendant's officers or employees committing the predicate acts in the course of their employment. *See Parker & Parsley Petrol Co. v. Dresser Indus.*, 972 F.2d 580, 584 (5th Cir. 1992); *Elliott v. Foufas*, 867 F.2d, 881 (5th Cir. 1989); *see also Parker*, at n.3 (interpreting *Elliott* to hold that "The employees must not be acting in the usual course of business to constitute part of the enterprise association separate from the employer."). Because a corporation's employees acting within the scope and course of their employment cannot be distinct from the corporation itself, a plaintiff fails to properly plead a RICO cause of action if they allege that a legal entity is the RICO defendant and an association of the defendant's employees is the RICO enterprise. *Id.* This analysis is irrelevant to this case.

Defendants further claim that Plaintiffs have not pled facts showing that MERS or the Defendants have an existence separate from the predicate acts of mail and wire fraud. This is simply not true. Plaintiffs have recognized that MERS "is a private corporation acting as a private national electronic registry" with a business of tracking "interests and servicing rights in

Case 3:12-cv-00220-JJB-SCR   Document 101-1   09/25/12   Page 15 of 22

mortgage loans", and specifically state that Plaintiffs do not allege "that the MERS system of serving as nominee and electronically tracking mortgage transfers is inherently invalid." SAC ¶¶ 33, 62. Plaintiffs have also identified each Defendant as a financial institution that conducts business separate and distinct from their participation in the MERS scheme. SAC ¶¶ 5-29, 69.

**D.    Plaintiffs Sufficiently Plead Proximate Causation.**

In *Bridge v. Phoenix Bond & Indemnity Company*,[5] the U.S. Supreme Court unanimously upheld a RICO claim predicated on mail fraud when the plaintiffs alleged that they lost the opportunity to obtain tax liens because the defendants conducted their business through a pattern of mail fraud related to misrepresenting to Cook County compliance with the local rules in order to avoid having only one bidder at the auctions. This case is analogous to *Bridge*: Plaintiffs have alleged that they have lost the opportunity to obtain recording fees because Defendants conducted their business through a pattern of mail fraud related to the MERS scheme in order to misrepresent to investors and the public the need to record mortgage assignments so that Defendants could avoid recording mortgage assignments that would otherwise have been recorded but-for the fraudulent misrepresentations.

As discussed in Plaintiffs' *Response*, the issue examined by the U.S. Supreme Court in *Bridge* was whether a plaintiff in a RICO claim predicated on mail fraud must show that they relied on the defendant's misrepresentations in order to establish causation. *Response*, at 29-30. The U.S. Supreme Court unanimously held that first-party reliance is not an element of a RICO claim predicated on mail fraud. *Bridge*, 553 U.S. at 661. It then responded to defendants' arguments that plaintiffs cannot establish proximate cause by noting, "Having rejected petitioners' argument that reliance is an element of a RICO claim based on mail fraud, we see no reason to let that argument in through the back door by holding that the proximate-cause analysis

_____

[5] *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639 (2008).

Case 3:12-cv-00220-JJB-SCR   Document 101-1   09/25/12   Page 16 of 22

under RICO must precisely track the proximate-cause analysis of a common-law fraud claim." *Bridge*, 553 U.S. at 655. The Court instructed that proximate cause in a RICO claim predicated on mail fraud merely requires that "the plaintiff's loss must be a foreseeable result of *someone's* reliance on the misrepresentation," and approved "the long line of cases in which courts have permitted a plaintiff directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation." *Bridge*, 553 U.S. at 656-57 (emphasis in original).

The case was remanded to the district court, which then dismissed the action on summary judgment based on a *Hemi*-type analysis and application. The district court was reversed again in a scathing opinion providing an in-depth proximate cause analysis by Judge Posner regarding civil RICO claims predicated on mail fraud, and certiorari was denied by the U.S. Supreme Court. *BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011), *cert. denied*, 123 S.Ct. 253 (2011). Defendants are inviting a similar result in this case by ignoring the fact that it was their own conduct of not recording the mortgage assignments that would have been recorded but-for the Defendants' mail fraud relating to the MERS scheme that damaged the Plaintiffs.

E.     **The SAC Sufficiently Pleads Specific Intent to Defraud.**

Defendants improperly attempt to hold Plaintiffs to their burden of proof at the pleading stage. Asking for "plausible grounds" to infer intent to defraud does not impose a probability requirement at the pleading stage; it simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of intent to defraud. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).

Defendants' *Reply* claims, for the first time, that "Defendants believed no duty to record mortgage assignments exists under federal or Louisiana law…" as an "obvious alternative

17

explanation" for their alleged intent to defraud. *See Reply*, at 17-18. However, the law is definite and knowable, and the common law presumes that every person knows the law. *Cheek v. United States*, 498 U.S. 192, 199 (1991). The general rule that ignorance of the law or mistake of law is no defense is deeply rooted in the American legal system. *Id.*

Even if ignorance of the law were a legitimate defense, and even if Plaintiffs were required to conclusively overcome that defense at the pleading stage, Plaintiffs have pleaded sufficient facts to plausibly suggest intent to defraud. *See Twombly*, 550 U.S. at 557. Defendants cannot claim they did not know they had a duty to maintain perfection on mortgages securing mortgage-backed securities when they themselves created and/or affirmed that duty in their prospectuses filed with the Securities and Exchange Commission. SAC ¶ 75.

Furthermore, Defendants recorded initial mortgages and mortgage assignments when the interest was transferred to a non-MERS member, showing they knew recording was necessary to maintain perfection and priority under applicable laws in those instances. SAC ¶ 60. Defendants also typically record an assignment to the current servicer or beneficial interest owner shortly before foreclosure, indicating they recognize that a transfer on the MERS system is not a legally perfected transfer of interest for foreclosure purposes. SAC ¶ 60. These actions demonstrate Defendants' awareness of recording laws and duties, which are the same laws that govern the priority and perfection of mortgage assignments to MERS members. Defendants' claim that they were ignorant of the legal consequences of failing to recording mortgage assignments is neither credible nor an "obvious alternative explanation" that would negate Plaintiffs' pleading of intent to defraud under *Twombly*. Despite plausible knowledge of a duty to maintain perfection and priority and knowledge that recording is essential to that maintenance, Defendants caused to be represented that the MERS system rendered recording unnecessary. SAC ¶ 75.

18

**F.    The SAC Sufficiently Pleads Facts Showing the Circumstances of the Alleged Fraudulent Scheme with Particularity.**

Defendants argue, also for the first time, that Plaintiffs have not alleged "conspiracy" with Rule 9(b) specificity. *Reply*, at 18. This is yet another example of Defendants' attempt to confuse the issues before the Court, because conspiracy is not even an element of Plaintiffs' cause of action and Plaintiffs have not pled a conspiracy. Plaintiffs' cause of action is based on 18 U.S.C. § 1964(c): "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." Defendants confuse this with 18 U.S.C. § 1964(d), which provides that "[i]t shall be unlawful for any person to conspire to violate any of the provisions in subsection (a), (b), or (c) of this section." Plaintiffs are suing under § 1964(c) and not § 1964(d). Conspiracy is not an element of Plaintiffs' cause of action and need not be pleaded at all, must less with Rule 9(b) specificity.

To the extent that Defendants continue to attack the particularity of Plaintiffs' mail and wire fraud allegations, Plaintiffs have sufficiently detailed the nature and mechanics of the underlying scheme to defraud to satisfy Rule 9(b). *See*, e.g., SAC ¶¶ 33-34, 35-41, 42-46, 50-54, 57, 60-63, 65-66, 71, 75, 77. The indictable act for mail fraud is not the fraudulent misrepresentation, but rather the use of the mails with the purpose of executing or attempting to execute a scheme to defraud. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 652 (2008). "[T]he complaint need not specify the time, place and content of each mail communication where the nature and mechanics of the underlying scheme is sufficiently detailed, and it is enough to plead the general content of the misrepresentation without stating the exact words used…Furthermore, a motion to dismiss under Rule 9(b) will be denied if the pleading contains

19

some allegations of fraud." *Giuliano v. Everything Yogurt, Inc.*, 819 F.Supp. 240, 244 (E.D.N.Y. 1993). In *Giuliano*, the plaintiffs' RICO complaint was found to satisfy Rule 9(b) where the plaintiffs "[did] not specify the exact dates of all of those communications, nor the respective speakers or writers of those communications," but, "the alleged scheme to defraud [was] sufficiently outlined to place defendants on notice so that they may frame a responsive pleading." *Id*. at 245. Here, Plaintiffs *have* directly quoted fraudulent statements from the MERS web site and procedures manual (SAC ¶ 65) and have attached to their complaint actual documents mailed or transmitted by each Defendant indicating the exact dates of those mailings (SAC ¶ 76; SAC Exhibit A). The plaintiffs in *Bridge* also used a representative sample of mailings to satisfy the pleading requirement in their RICO case, which was unanimously upheld by the U.S. Supreme Court. *See Bridge v. Phoenix Bond & Indemnity Co.*, No. 1:05-cv-04095, Corrected Second Amended Complaint & Demand for Jury (September 4, 2007), *available at* https://ecf.ilnd.uscourts.gov/doc1/06706309350. Defendants cannot legitimately claim they do not have notice of the alleged scheme to defraud such that they cannot prepare a response.

**G.      Veil Piercing is not Relevant to this Case.**

Plaintiffs are suing each Defendant for its individual role in the MERS scheme and are not attempting to hold Defendants liable for the actions of MERS generally. The RICO enterprise and the RICO defendant must be separate entities. *Bishop v. Corbitt Marine Ways, Inc.*, 802 F.2d 122, 122 (5th Cir. 1986). Each Defendant is a legal entity separate and apart from MERS. SAC ¶¶ 68-71.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion, and for such other and further relief which they are justly entitled to at law or equity.

20

Respectfully submitted,

BLUME, FAULKNER,
SKEEN & NORTHAM, PLLC
**Richard D. Faulkner,** *Local Counsel*
Louisiana Bar No. 05470
**James D. Blume**
Admitted *Pro Hac Vice*
111 W. Spring Valley Road
Suite 250
Richardson, Texas 75081
(214) 373-7788
(214) 373-7783 – fax

**TED B. LYON & ASSOCIATES**
**Ted B. Lyon,** *Trial Attorney*
Admitted *Pro Hac Vice*
**Marquette Wolf**
Admitted *Pro Hac Vice*
**Benjamin Barmore**
Admitted *Pro Hac Vice*
18601 LBJ Freeway
Suite 525
Mesquite, Texas 75150
(972) 279-6571
(972) 279-3021 - fax

**MARTINY & ASSOCIATES, LLC**
**Daniel R. Martiny**
Louisiana Bar No. 09012
131 Airline Drive
Suite 201
Metairie, Louisiana 70001
(504) 834-7676
(504) 834-5409 - fax

**MURRAY, DARNELL &
ASSOCIATES, LLC**
**Edwin R. Murray**
Louisiana Bar No. 17069
1540 North Broad Street
New Orleans, Louisiana 70119
(504) 945-0042
(504) 942-5268 – fax

**BARKER, BOUDREAUX,
LAMY & FOLEY**
**Daniel S. Foley**
Louisiana Bar No. 5632
228 Saint Charles Avenue
Suite 1110
New Orleans, Louisiana 70130
(504) 586-9395
(504) 586-9410 - fax

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this the 25th day of September, 2012, a copy of the foregoing Memorandum of Law in Support of Plaintiff's Sur-Reply to Defendants' Motion to Dismiss First Amended Complaint was filed electronically to the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to all CM/ECF participants by operation of the court's electronic filing system. I also certify that I have mailed by United States Postal Service this filing to all non-CM/ECF participants, if any.

Richard D. Faulkner